UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED**

APR 2 6 2004

CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

GEORGE LUIS DeJESUS,

       Petitioner,

   -vs.-

BLAINE C. LAFLER, Warden,

       Respondent.

_____/

Michigan Attorney General
Attorney for Respondent
----------------------------------------------
Laura Kathleen Sutton (P40775)
Attorney for Petitioner DeJesus
_____/

Civil Action No.

Hon.

**04 71553**

GEORGE CARAM STEEH

MAGISTRATE JUDGE SCHEER

**CIVIL COVER SHEET**
**PETITION FOR WRIT OF HABEAS CORPUS**
**BRIEF IN SUPPORT OF WRIT OF HABEAS CORPUS**
**PROOF OF SERVICE**

BY:

    LAURA KATHLEEN SUTTON (P40775)
    Attorney for Petitioner DeJesus
    PO Box 388
    Manchester, Michigan 48158
    (734) 428-7445

JS 44 11/99

# CIVIL COVER SHEET

COUNTY IN WHICH THIS ACTION AROSE: _Oakland_

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**04 71553**

**GEORGE CARAM STEEH**

**MAGISTRATE JUDGE SCHEER**

## I. (a) PLAINTIFFS

GEORGE LUIS DeJESUS

## DEFENDANTS

BLAINE C. LAFLER, WARDEN

**(b)** County of Residence of First Listed _SAGINAW_

County of Residence of First Listed _SAGINAW_

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorneys (Name, Address and Telephone Number)

LAURA KATHLEEN SUTTON (P40775)
P.O. BOX 388
MANCHESTER, MICHIGAN  734 428-7445

Attorneys (If Known)

MICHIGAN ATTORNEY GENERAL
HABEAS CORPUS DIVISION
P.O. BOX 30212
LANSING, MICHIGAN 48909

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PLA | DEF | | PLA | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21; 891 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | | | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC |
| ☐ 150 Recovery of Overpayment and Enforcement of Judgment | ☐ 320 Assault, Libel And Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced & Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☒ 530 General | ☐ 790 Other Labor Litigation | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. 2254   VIOLATIONS OF THE V, VI AND XIV AMENDMENTS

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

$ DEMAND

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE                    DOCKET NUMBER

DATE  4-26-2004

SIGNATURE OF ATTORNEY OF RECORD

x _Laura Kathleen Sutton_

# PURSUANT TO LOCAL RULE 83.11

1.        **Is this a case that has been previously dismissed?**     ❑ **Yes**
                                                                ☒ **No**

   **If yes, give the following information:**

   Court: _____

   Case No.: _____

   Judge: _____

2.        **Other than stated above, are there any pending or previously**
          **discontinued or dismissed companion cases in this or any**     ❑ **Yes**
          **other court, including state court? (Companion cases are**     ☒ **No**
          **matters in which it appears substantially similar evidence will**
          **be offered or the same or related parties are present and the**
          **cases arise out of the same transaction or occurrence.)**

   **If yes, give the following information:**

   Court: _____

   Case No.: _____

   Judge: _____

   Notes:

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED**

APR 2 6 2004

CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

GEORGE LUIS DeJESUS,

      Petitioner,

  -vs.-

BLAINE C. LAFLER, Warden,

      Respondent.

_____/

Michigan Attorney General
Attorney for Respondent

------------------------------------------

Laura Kathleen Sutton (P40775)
Attorney for Petitioner DeJesus

_____/

Civil Action No.

Hon.

04 71553

GEORGE CARAM STEEH

MAGISTRATE JUDGE SCHEER

## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner GEORGE LUIS DeJESUS, by and through his attorney, Laura Kathleen Sutton (P40775), pursuant to 28 U.S.C. §2254, petitions this Honorable Court to grant him a Writ of Habeas Corpus, and respectfully states:

    1.    Petitioner DeJesus is a citizen of the United States.

    2.    Petitioner DeJesus is a resident of the State of Michigan, currently domiciled in the Saginaw Correctional Facility, Freeland, Michigan.  Petitioner is currently being held as prisoner number 247204.

    3.    Saginaw Correctional Facility is a state prison operated by the State of Michigan.  Respondent Blaine C. Lafler is the Warden of the Saginaw Correctional Facility.

1

4.    On December 11, 1997, Petitioner was convicted for 1 count of first-degree murder, MCL 750.316(1)(b), 1 count of first-degree premeditated murder, MCL 750.316(1)(a), 1 count of first-degree criminal sexual conduct, MCL 750.520(b), and 3 counts of possession of a firearm during the commission of a felony, MCL 750.227(b), in Oakland County, Michigan, Circuit Court.   On December 11, 1997, the Honorable Robert L. Templin, presiding trial judge, vacated 1 first-degree murder conviction and 1 felony-firearm conviction, and then imposed a mandatory life in prison without parole for the remaining first-degree murder conviction, life in prison for first-degree criminal sexual conduct conviction, and 2 years in prison for each felony firearm conviction.[1]

5.    Venue is proper in this Court because Petitioner was convicted in Oakland County, which is in the Eastern District.

6.    Petitioner has exhausted all state remedies with regard to the constitutional arguments raised in this petition by taking the following steps:

a. Petitioner's direct appeal to the Michigan Court of Appeals was denied in a PER CURIUM opinion dated June 18, 1999, under Docket No. 209388, People v. George Luis DeJesus. [2]

---

[1]    On appeal the Michigan Court of Appeals vacated the first-degree criminal sexual conduct conviction and 1 felony firearm conviction on double jeopardy grounds, since those offenses supported the vacated conviction of felony murder.

[2]    In an Order issued on July 6, 1998, the Michigan Court of Appeals consolidated George Luis DeJesus' appeal with that of his brother, Melvin DeJesus, thus the July 18, 1999 opinion of Michigan Court of Appeals contains rulings and comment as to both individuals.

b. Petitioner's application seeking leave to appeal the June 18, 1999, Court of Appeals decision to the Michigan Supreme Court was denied in all respects. People v. George Luis DeJesus, (Docket No. 115545, May 31, 2000).

c. Petitioner filed a motion for relief from judgment in Oakland County Circuit Court pursuant to the provisions of MCR 6.500 et sq. on May 30, 2001. The Oakland County Circuit Court denied relief in all respects on January 14, 2002.

d. Petitioner's application seeking leave to appeal the January 14, 2002, decision of the Oakland County Circuit Court to the Court of Appeals was denied in all respects. People v. George Luis DeJesus, (Docket No. 246201, July 18, 2003).

e. Petitioner's application seeking leave to appeal the July 18, 2003, Court of Appeals ruling to the Michigan Supreme Court was denied in all respects. People v. George Luis DeJesus, (Docket No. 124580, January 27, 2004).

7.    No other relief from the judgment has been sought.

8.    As set forth in the accompanying Brief in Support of Petition for Writ of Habeas Corpus, Petitioner George Luis DeJesus is being detained unconstitutionally because his convictions are invalid, and he bases his assertion on the following grounds:

**I.    THE ERRONEOUS ADMISSION OF IRRELEVANT AND HIGHLY PREJUDICIAL TESTIMONY ALLEGING PETITIONER WAS A MEMBER OF A GANG DEPRIVED HIM OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL UNDER THE FEDERAL CONSTITUTION.**

**II.    THE STATE TRIAL COURT ERRED BY ALLOWING INADMISSIBLE HEARSAY EVIDENCE IN AT TRIAL, DEPRIVING PETITIONER OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL.**

**III.    THE STATE TRIAL COURT DEPRIVED PETITIONER OF HIS DUE PROCESS RIGHTS TO A FAIR TRIAL BY PERMITTING THE PROSECUTION TO PRESENT HIGHLY INFLAMATORY IMAGES TO THE JURY FROM OPENING STATEMENT AND THROUGHOUT THE TRIAL.**

**IV.   THE STATE PROSECUTOR'S REPEATED MISCONDUCT WAS SO EGREGIOUS THAT IT WHOLLY UNDERMINED THE TRIAL, RENDERED THE VERDICT UNRELIABLE, AND DEPRIVED PETITIONER OF DUE PROCESS AND AN IMPARTIAL TRIAL BY JURY AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION.**

**V.   PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN THE TRIAL COURT DENIED THE MOTION FOR A DIRECTED VERDICT WHRE THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH THE CHARGES.**

**VI.   THE MICHIGAN STATE COURTS DENIED PETITIONER DUE PROCESS BY (A) REFUSING TO PROVIDE AVAILABLE DNA BIOLOGICAL SAMPLES FOR INDEPENDENT TESTING AND (B) IN FAILING TO CONDUCT A HEARING WITH RESPECT TO A POST-APPEAL EXPERT FORENSIC SCIENTIST'S REPORT DISPUTING THE STATE'S EVIDENCE ON THE CRITICAL ELEMENT OF THE MURDER CHARGE, AFTER REFUSING TO APPOINT AN EXPERT AT TRIAL.**

9.     As shown by the accompanying Brief in Support of Petition for Writ of Habeas Corpus, the above grounds establish that Petitioner's federal rights were denied during this state court prosecution.   U.S. Const. Amends. V, VI, XIV.

10.     This Court should accordingly grant Petitioner DeJesus a writ of habeas corpus because the state courts' treatment of his case "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was based on an "unreasonable determination" of the facts in light of the evidence presented in the state court.   28 U.S.C. §2254(d)(1) and (d)(2), i.e., the AEDPA standards.

11.     Petitioner does request discover and evidentiary hearings.

12.     Petitioner has not filed any previous Petition for Writ of

4

Habeas Corpus in this or any other federal district court.

13.    This petition is timely brought within the one-year statute of limitations for habeas corpus actions under 28 U.S.C. §2244(d)(1)(a).

14.    Petitioner incorporates by reference the Brief in Support of Petition for Writ of Habeas Corpus.

### RELIEF SOUGHT

**WHEREFORE**, Petitioner GEORGE LUIS DeJESUS respectfully requests that this Honorable Court grant the following relief:

a. That Respondent be required to appear and answer the allegations of this Petition;

b. That this Court grant oral argument, grant discovery, and/or hold evidentiary hearings as necessary and requested in this matter;

c. That this Court grant such other, further and different relief as the Court may deem just and proper under the circumstances; and

d. That after full consideration, this Court relieves Petitioner DeJesus of the unconstitutional restraint on his liberty.

Respectfully submitted,

LAURA KATHLEEN SUTTON (P40775)
Attorney for Petitioner DeJesus
PO Box 388
Manchester, Michigan 48158
(734) 428-7445

Dated:  April 26, 2004.

5

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE LUIS DeJESUS,

       Petitioner,

   -vs.-

BLAINE C. LAFLER, Warden,

       Respondent.

_____/
Michigan Attorney General
Attorney for Respondent
-------------------------------------------
Laura Kathleen Sutton (P40775)
Attorney for Petitioner DeJesus
_____/

Civil Action No. **04  71553**

Hon. GEORGE CARAM STEEH

MAGISTRATE JUDGE SCHEER

**FILED**

APR 2 9 2004

CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

**BRIEF IN SUPPORT OF WRIT OF HABEAS CORPUS**

BY:
      LAURA KATHLEEN SUTTON (P40775)
      Attorney for Petitioner DeJesus
      PO Box 388
      Manchester, Michigan 48158
      (734) 428-7445

## **TABLE OF CONTENTS**

Table of Contents.................................................................................I

Index of Authorities...........................................................................II

Statement of Questions Presented..................................................IV

Statement of Facts and Material Proceedings.................................1

     Procedural History.........................................................................1

     Case Overview Proceeding............................................................2

     The 1997 Trial Transcript Record................................................6

     Statement Regarding Exhaustion................................................29

     Statement on Custody...................................................................30

     Statement on Statute of Limitations............................................30

     Habeas Standards and the AEDPA................................................30

**Law and Argument**:

I.     THE ADMISSION OF IRRELEVANT AND HIGHLY
      PREJUDICIAL TESTIMONY ALLEGING PETITIONER
      WAS A MEMBER OF A GANG DEPRIVED HIM OF
      HIS DUE PROCESS RIGHT TO A FAIR TRIAL UNDER
      THE FEDERAL CONSTITUTION................................................34

II.    THE STATE TRIAL COURT ERRED BY ALLOWING
      INADMISSIBLE HEARSAY EVIDENCE  AT TRIAL,
      DEPRIVING PETITIONER OF HIS DUE PROCESS
      RIGHT TO A FAIR TRIAL.........................................................42

III.   THE STATE TRIAL COURT DEPRIVED PETITIONER
      OF HIS DUE PROCESS RIGHTS TO A FAIR TRIAL BY
      PERMITTING THE PROSECUTION TO PRESENT HIGHLY
      INFLAMATORY IMAGES TO THE JURY FROM OPENING
      STATEMENT AND THROUGHOUT THE TRIAL.........................50

IV.   THE STATE PROSECUTOR'S REPEATED MISCONDUCT WAS SO EGREGIOUS THAT IT WHOLLY UNDERMINED THE TRIAL, RENDERED THE VERDICT UNRELIABLE, AND DEPRIVED PETITIONER OF DUE PROCESS AND AN IMPARTIAL TRIAL BY JURY AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION.................................................57

V.   PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN THE TRIAL COURT DENIED THE MOTION FOR DIRECTED VERDICT WHRE THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH THE CHARGES........................................................................61

VI.   THE   MICHIGAN STATE COURTS DENIED PETITIONER DUE PROCESS BY (A) REFUSING TO PROVIDE AVAILABLE DNA BIOLOGICAL SAMPLES FOR INDEPENDENT TESTING AND (B) IN FAILING TO CONDUCT A HEARING WITH RESPECT TO A POST-APPEAL EXPERT FORENSIC SCIENTIST'S REPORT DISPUTING THE STATE'S EVIDENCE ON THE CRITICAL ELEMENT OF THE MURDER CHARGE, AFTER REFUSING TO APPOINT AN EXPERT AT TRIAL...............65

Summary and Relief Sought........................................................................73

## INDEX OF AUTHORITIES

Baldwin v Reese, _____ U.S. ____ (No. 02-964, March 2, 2004)......................37

Barker v. Yukens, 199 F.3d 867 (6th Cir. 1999)............................................49

Berger v. United States, 295 U.S. 78 (1935)..................................................57

Brecht v. Abrahamson, 507 U.S. 619 (1993)....................32,34,41,42,49,51,56

Brumley v. Wingard, 269 F.3d 629 (6th Cir. 2001).........................................31

Bugh v. Mitchell, 329 F.3d 496 (6th Cir. 2003)...............................................48

Clemmons v. Sowder, 34 F.3d 352 (6th Cir. 1994).........................................48

Cremeans v. Chapleau, 62 F.3d 167 (6th Cir. 1995).......................................32

Dawson v. Delaware, 503 U.S. 159 (1992)..................................................36,39

Donnelly v. DeChristoforo, 416 U.S. 637 (1974)............................................57

Duncan v. Henry, 513 U.S. 364 (1995).........................................................37

East v. Scott, 55 F.3d 996 (5th Cir. 1995).....................................................34

Estelle v. McGuire, 501 U.S. 62 (1991).........................................................47

Gilliam v. Mitchell, 179 F.3d 990 (6th Cir. 1999)...........................................49

Harris v. Stovall, 212 F.3d 940 (6th Cir. 2000)......................................38,55,59

Jackson v. Virginia, 443 U.S. 30 (1979)........................................................61

Kyger v. Carlton,  146 F.3d 374 (6th Cir. 1998)...................................32,41,56

Lilly v. Virginia, 527 U.S. 116 (1999)............................................................42

Maryland v. Craig, 497 U.S. 836 (1990)........................................................42

Old Chief v. United States, 519 U.S. 172 (1997)..................................50.53,56

O'Neal v. McAninch, 513 F.3d 432, 435 (1995)....................................32,41,49,64

O'Sullivan v. Boerckel, 526 U.S. 838 (1999)..................................................29

Payne v. Tennessee, 501 U.S. 808, 825 (1991).........................................50,56

People v. Aaron, 409 Mich. 672 (1980).........................................................63

People v. Bradford, 69 Mich. App. 583 (1976)...............................................35

People v. Herman Brown, 38 Mich. App. 69 (1972).........................................35

People v. Logie, 321 Mich. 303 (1948).........................................................35

People v. Lyles, 148 Mich. App. 583 (1986)...................................................64

People v. Oster, 67 Mich. App. 490 (1975)....................................................63

People v. Page, 83 Mich. App. 412 (1978)......................................................35

Pointer v. Texas, 380 U.S. 400 (1965)..........................................................42

Rust v. Zent, 17 F.3d 155 (6th Cir. 1994)....................................................29

Sawyer v. Hofbauer, 299 F.3d 605 (6th Cir. 2002).......................................45

Scales v. United States, 367 U.S. 203 (1984)...............................................34

Schulp v. Delo, 513 U.S. 298 (1995)............................................................72

Shackleford v. Hubbard, 243 F.3d 1072  (9th Cir. 2000)......................36,44,55

Sizemore v. Fletcher, 921 F.2d 667 (6th Cir. 1990)......................................60

Tome v. United States, 513 U.S. 150 (1995)................................................45

Toney v. Gammon, 79 F.3d 693 (8th Cir. 1996).............................................69

United States v. Abel, 469 U.S. 45 (1977)..........................................34,38,39

United States v. Ebens, 800 F.2d 1422 (6th Cir. 1986)................................34

United States v. Friedman, 909 F.2d 705 (2nd Cir. 1990)..............................60

United States v. Hendrix, 52 F.3d 326 (6th Cir. 1995)..................................39

United States v. Irvin, 87 F.3d 860 (7th Cir. 1996).......................................39

United States v. Young, 470 U.S. 1 (1985)....................................................60

Viereck v. United States, 318 U.S. 236 (1943).........................................57,60

Vroman v. Brigano, 346 F.3d 598, 603 (6th Cir. 2003)..................................38

Wiggins v. Smith, 539 U.S. ___; 123 S. Ct. 2527 (2003).............................32

Williams v. Coyle, 260 F.3d 684, 706 (6th Cir. 2001)...................................32

Williams v. Taylor, 529 U.S. 362, 412 (2000)..............................................31

Ylst v. Nunnemaker, 501 U.S. 797 (1991).........................................36,44,55

U.S. Const. Am. V...............................................................................passim
U.S. Const. Am. VI..............................................................................passim
U.S. Const. Am. XIV............................................................................passim
28 U.S.C. §2254.................................................................................passim

M.C.L. 750.227(b).....................................................................................61
M.C.L. 750.316(1)(b).................................................................................61
M.C.L. 750.520(b).....................................................................................61
M.C.L. 770.16...........................................................................................68

M.R.E. 801(d)(1)(B)..................................................................................46

## STATEMENT OF QUESTIONS PRESENTED

### I.

WHETHER THE ADMISSION OF IRRELEVANT AND HIGHLY PREJUDICIAL TESTIMONY ALLEGING PETITIONER WAS A MEMBER OF A GANG DEPRIVED HIM OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL UNDER THE FEDERAL CONSTITUTION?

Petitioner answers, "Yes."

### II.

WHETHER THE STATE TRIAL COURT ERRED BY ALLOWING INADMISSIBLE HEARSAY EVIDENCE AT TRIAL, DEPRIVING PETITIONER OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL?

Petitioner answers, "Yes."

### III.

WHETHER THE STATE TRIAL COURT DEPRIVED PETITIONER OF HIS DUE PROCESS RIGHTS TO A FAIR TRIAL BY PERMITTING THE PROSECUTION TO PRESENT HIGHLY INFLAMATORY IMAGES TO THE JURY FROM OPENING STATEMENT AND THROUGHOUT THE TRIAL?

Petitioner answers, "Yes."

### IV.

WHETHER THE STATE PROSECUTOR'S REPEATED MISCONDUCT WAS SO EGREGIOUS THAT IT WHOLLY UNDERMINED THE TRIAL, RENDERED THE VERDICT UNRELIABLE, AND DEPRIVED PETITIONER OF DUE PROCESS AND AN IMPARTIAL TRIAL BY JURY AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION?

Petitioner answers, "Yes."

## IV.

WHETHER PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN THE TRIAL COURT DENIED THE MOTION FOR DIRECTED VERDICT WHRE THERE WAS INSUFFICIENT EVIDENCE TO ESTABLISH THE CHARGES?

Petitioner answers, "Yes."

## VI.

WHETHER THE  MICHIGAN STATE COURTS DENIED PETITIONER DUE PROCESS BY (A) REFUSING TO PROVIDE AVAILABLE DNA BIOLOGICAL SAMPLES FOR INDEPENDENT TESTING AND (B) IN FAILING TO CONDUCT A HEARING WITH RESPECT TO A POST-APPEAL EXPERT FORENSIC SCIENTIST'S REPORT DISPUTING THE STATE'S EVIDENCE ON THE CRITICAL ELEMENT OF THE MURDER CHARGE, AFTER REFUSING TO APPOINT AN EXPERT AT TRIAL

Petitioner answers "Yes".

## STATEMENT OF FACTS AND MATERIAL PROCEEDINGS

### Procedural History

Petitioner GEORGE LUIS DeJESUS was convicted for 1 count of first-degree murder, MCL 750.316(1)(b), 1 count of first-degree premeditated murder, MCL 750.316(1)(a), 1 count of first-degree criminal sexual conduct, MCL 750.520(b), and 3 counts of possession of a firearm during the commission of a felony, MCL 750.227(b), in Oakland County, Michigan, Circuit Court.  On December 11, 1997, the Honorable Robert L. Templin, presiding trial judge, vacated 1 first-degree murder conviction and 1 felony-firearm conviction, and then imposed a mandatory life in prison without parole for the remaining first-degree murder conviction, life in prison for first-degree criminal sexual conduct conviction, and 2 years in prison for each felony firearm conviction.[1]

On his appeal of right, the Michigan Court of Appeals, People v. George Luis DeJesus, unpublished, Docket No. 209388 (June 18, 1999) affirmed the convictions.  On May 31, 2000, the Michigan Supreme Court issued an order denying Petitioner's application seeking Leave to Appeal, Docket No.115545, thus concluding the appeal of right.  On May 30, 2001, Petitioner filed a Motion for Relief from Judgment in the Oakland County Circuit Court.  The motion was assigned to successor judge, the Honorable Wendy Potts.  On January 14, 2002, Judge Potts

---

[1]    On appeal the Michigan Court of Appeals vacated the first-degree criminal sexual conduct conviction and 1 felony firearm conviction on double jeopardy grounds, since those offenses supported the vacated conviction of felony murder.

1

found the issues to be lacking in merit and issued an opinion and order denying Petitioner's request for relief, evidentiary hearings, and DNA testing of potentially exculpatory material.   The Michigan Court of Appeals denied Petitioner leave to appeal the decision of the Oakland County Circuit Court.   People v. George Luis DeJesus, (Docket No. 246201, July 18, 2003).  The Michigan Supreme Court rendered the final state court judgment in this case by denying Petitioner's application seeking leave to appeal the July 18, 2003 Order of the Court of Appeals "because defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." People v. George Luis DeJesus, (Docket No. 124580, January 27, 2004).

## Statement of Facts

### A. Case Overview

Over the weekend of July 8-9 1995, Margaret Agnes Midkiff was murdered in the basement of her home at 659 Peacock Street, Pontiac, Michigan.  Her body was discovered there on July 11, 1995 by her son Jeremy Wilkes. (T.T. 12-2-97 p. 75).  She was naked. Her hands and feet were bound with telephone cord.  A blood-soaked pillowcase was tied around her head with a piece of phone cord. She had been raped both vaginally and anally.  She was beaten or kicked around the head.  Her nightclothes and lingerie were found on the bedroom floor and the bedroom drawers had been gone through. (T.T. 12-4-97 p. 13). No money, jewelry or other valuables were taken. (T.T. 12-4-97 p. 55). In

2

fact, the victim was wearing a necklace and two charms and a ring on each hand when found. (T.T. 12-5-97 p. 28). The beating occurred in the basements there were no traces of blood upstairs.

The scene was completely processed for prints, fibers and serological evidence.   (T.T. 12-4-31 p.p. 42, 134).   The subsequent autopsy confirmed the sexual assault and stated the cause of death as swelling of the brain as a result of repeated head trauma. (T.T. 12-5-97 p. 16).

The ensuing investigation was lengthy. After speaking with family members, friends and neighbors and evaluating the initial evidence collected at the scene, the Pontiac Police Department turned over primary responsibility of the investigation to the Oakland County Homicide Task Force who in turn, handed over responsibility to the Oakland County Sheriff's Department Special Investigations Unit in late September 1995. The Officer in charge of the investigation was Detective Sergeant William Harvey.   (T.T. 12-8-97 p.p. 154-155).   The police suspected Melvin and George DeJesus and their friend Brandon Gohagen were involved but had no evidence to connect them to the crime.

On November 9, 1995, pursuant to a search warrant, blood, hair, semen and saliva samples were taken from the DeJesus brothers and their friends Brandon Gohagen and Kevin Harvey. Their shoes were also confiscated and probed for trace evidence. The blood samples were ultimately sent to Cellmark Laboratories for DNA analysis. (T.T. 12-4-97 p. 100). In September 1996. DNA evidence connected Brandon Gohagen

3

to the sexual assault of Midkiff. (T.T. 12-8-97 p.p. 140-42). No physical evidence connected the DeJesus brothers to the Midkiff homicide. (Ibid).

On September 19, 1996, an arrest warrant was issued for Brandon Gohagen. Gohagen, apparently alerted that there was a warrant out for his arrest, went to Florida with another friend with an outstanding warrant - - Terrell Gholston. Acting on a tip, Gholston and Gohagen were arrested in Tampa, Florida. On September 25, 1996, confronted by the DNA evidence, Gohagen admitted to raping Margaret Midkiff and implicated Melvin and George DeJesus in her murder.

Melvin DeJesus maintained throughout the investigation that he had nothing to do with Margaret Midkiff's rape and murder. (See Audio Statement Of November 9, 1995; Video Statement of September 25, 1996).[2] He outlined a potential alibi defense to investigators at his September 25, 1996 interview, stating he was with girlfriend Crystal Sauro after 11:00 P.M. on July 8, 1995. Gohagen had dropped him off at the Sauro residence and Ms. Sauro's father had driven Crystal and Melvin to the DeJesus residence where they had spent the night. The following day, Crystal Sauro was questioned, intimidated and threatened by investigators with perjury charges as well as charges for Melvin for statutory rape should she testify for him.

On July 22 1997, after a proffer agreement was worked out with Gohagen, Gohagen's lawyer and the Oakland County Prosecutor's Office,

---

[2]   Transcripts of these Audio and Video statements were filed with the Michigan Court of Appeals on the direct appeal and therefore are a part of the lower court record.

4

Melvin DeJesus was arrested for the rape and murder of Margaret Midkiff. George DeJesus was transported from Carson City Correctional Facility to Pontiac and charged the following day. Brandon Gohagen was the primary witness at the September 4, 1997 preliminary examination and the December 1997 trial and the only witness that connected the DeJesus brothers to the crime. (T.T. 12-4-97 48-76). Crystal Sauro was interviewed briefly by Defense Counsel but was called as a Prosecution witness. (T.T. 12-5-97 p.p. 144-152). George DeJesus did not testify at trial. Both DeJesus brothers were convicted of First-Degree Murder, Felony Murder and First-Degree Criminal Sexual Conduct (under an aiding and abetting theory) and three counts of Felony Firearm apiece. (T.T. 12-11-97 p.p. 104-105).

On December 30, 1997, Melvin and George DeJesus were sentenced to life in prison for the First-Degree Murder conviction and to a concurrent parolable life term for the Criminal Sexual Conduct conviction and to two mandatory terms for the Felony Firearms convictions. The Felony Murder conviction and an additional count of Felony Firearm were not given sentences. (S.T. 12-30-97 p.p. 16, 27-28). Brandon Gohagen pled guilty to Second-Degree Murder and First-Degree Criminal Sexual Conduct. He was sentenced after the DeJesus brothers and was given 35 to 80 years in prison. (Case No. 96-149493-FC).

5

### B.  The December 1997 Trial Transcript Record

Melvin and George DeJesus were separately charged with First-Degree Murder, Felony Murder, First Degree Criminal Sexual Conduct and three counts of Felony Firearm in the rape and murder of Margaret Agnes Midkiff.   Their respective cases were consolidated for the preliminary examination and trial.  They were represented by appointed counsel Donald P. Williams, (P22341) and Elias Escabedo, (P37808) respectively.  The case was assigned to visiting judge Robert L. Templin.

Prior to trail, Attorney Escabedo, motioned the Court for a severance of the cases and as an alternative, separate juries.  (T.T.12-1-98 p.p. 9-16).  Attorney Williams joined in the motion for separate juries in light of Attorney Escabedo's stated intention to incriminate Melvin DeJesus (Id.11).  Judge Templin denied the motion.  (Id.9, 16).

After the jury was sworn and recessed to the jury room, the Prosecutor informed the Court that she intended to use photographs in her opening statement – as "illustrative of some of the points I'm trying to make"—and sought their admission prior to trial.  (T.T. 12-1-97 p.p. 152-153).  Defense Counsel both objected to this procedure.  After a lengthy colloquy, the Court adjourned the matter until the following afternoon to allow the Prosecutor to lay a foundation for the photographs' admissibility.  The jury was reconvened, and excused for the day with the warning not to read about the case in the local press.  (Id. 159-160).

6

The following afternoon Attorney Escabedo summarized the
Defense objections to the admission of photographs in opening statement
as follows:

> . . . And what you have here is the Prosecution publishing to
> the jury, before the defense has had an opportunity to make
> its statement with respect to the defense interpretation of the
> case, evidence which may be admissible at trial. And I'm not
> saying to you at this point that we're objecting to the
> admissibility of the evidence, I'm saying to the Court that at
> this point in time and in this fashion, to permit evidence to
> be published to the jury before the defense has had an
> opportunity to present its case, is an absolute violation of
> (the clients) entitlement to due process and the various rules
> that I've already mentioned to the Court and case law. (T.T.
> 12-2-97 p. 7).

The Prosecutor responded in part as follows:

> . . .These pictures are illustrative, the case law that he cited
> to the Court is the prosecutor can say anything that is
> illustrative of what they're trying to prove. In this case,
> these photographs are significant and they are probative of
> the element of premeditation in this case. They illustrate
> what I'm talking about when I talk about the bound wrists,
> bound hands, the extent of injuries, the magnitude, that's
> what I'm proving in this case . . . . . (Id. 9).

The court allowed the use of the photographs in opening statement
under the following rationale:

> Okay, what we're going to do is, it is sort of a close call, it's a
> very close call, but the Court looks at it this way, when she –
> we'll have testimony to lay the foundation to be presented as
> evidence right now, the deputy is here to testify to that. And
> that will be used as part of her opening statement, instead of
> saying the body was kicked and this and that, she has this
> photograph, a large photograph to show what it was. It's not
> being used as evidence but as an illustration in your opening
> statement. On that basis we're going to go ahead. (TT 12-2-
> 97 12).

7

Deputy Ferich, Crime Lab Specialist with the Oakland County Sheriff's Department, testified concerning his initial observations at the crime scene and identified the three large photographs on the poster board as being of the victim, her nude body, pillow case over head bound with cord and the binding on her hands and feet. Deputy Ferich stated he took the original pictures and the enlargements were copies of the original. (T.T. 12-2-97 p.p. 14-15). The photographs on the poster board were ruled admissible. (Id. 16).

Prosecutor Pendergast began her opening statement as follows:

It's said that every picture tells a story. These pictures are no exception. They tell a story of terror, a story of horror, a story of brutal violence and premeditated murder.

Not only a story, but the final chapter in the life of a 43 year old woman who died alone, terrified, on the cold floor, and in an agonizing manner, the epitome of senseless violence and destruction. This case involved the obliteration of a human life. They're horrifying aren't they? And yet, they're nothing compared to the horror suffered by Margaret Midkiff in the last moments of her life. The moments she spent naked, already raped, vaginally and anally, now on a cold basement floor, bound at the wrists and ankles, pillow case over her head cord around her neck, begging for her life.

. . .She would die on that basement floor, kicked until blood streamed out of her body, kicked to death by the men in these two chairs, George and Melvin DeJesus, two brutal and savage murders who would deliver kick after kick, transforming a living breathing human being, into that, Oakland County Morgue number 554 for 1995, Margaret Midkiff, unfortunate victim of a brutal and violent attack, an act of evil, so enormous that it defies comprehension.

. . .Plain and simple it was an execution with all the elements of some sort of Grade B horror movie, terror, torture, a rape. But unfortunately more real than any movie. Far more terrifying. Far more lethal. No movie, no

8

nightmare, but real life here in Oakland County. That's why you are here today. . . .(T.T.12-2-97 p.p. 16-18).

Angela Rodriguez, the victim's daughter, testified that she had last seen her mother alive on Friday July 7, 1995 when she assisted her brother Jeremy Wilkes and his girlfriend Amber Manns in moving from her mother's home. On Tuesday July 11, 1995, she became concerned about her mother's welfare because the family had not heard from her in several days and her home appeared closed up. She then called her brother Jeremy and asked him to check on their mother. She stated that her mother had been an alcoholic in the past but had remained "clean" for five years. She further testified that she knew the DeJesus family as they had lived next door to her mother for approximately 15 years. (T.T. 12-2-97 p.p. 43-51) On redirect examination, Rodriguez testified over objection, that her mother had problems with Melvin DeJesus and that she did not want her brother Jeremy to hang around with Melvin and his brother because they were "trouble". (Id. 60-61).

Jeremy Wilkes, the victim's son testified, he last saw his mother alive when he moved from her home on July 7, 1995. He had spoken to her by telephone from work on the morning of Saturday July 8, 1995. He had had no contact with her on Sunday or Monday but went to check on her on Tuesday afternoon after receiving a call from his sister Angela. He further testified that when he received the call he was at his new apartment with Melvin DeJesus celebrating the birth of his daughter. He stated he knew the DeJesus brothers well because they were next-

9

door neighbors but that he did not hang around with them because "they were in a gang and pretty much getting into trouble. . ." (T.T. 12-2-97 p.p. 67-68). Both Attorneys objected and requested a mistrial. (T.T. 12-2-97 p.p. 105-107). Wilkes admitted that he was associating with the DeJesus brothers and Brandon Gohagen "almost every day" up to the time when his mother's body was found and that George and Melvin DeJesus had been in his mother's home "hundreds" of times and that Brandon Gohagen had been there "a lot" too. (Ibid.)

Wilkes testified that Melvin DeJesus accompanied him to his mother's home but did not go in. Upon entering the home, Wilkes went to her bedroom where he discovered the room in disarray with the "answering machine and phone cords ripped from the wall, a lot of clothes scattered and purse ran through". (T.T. 12-2-97 p. 73). He then proceeded to the basement where he discovered his mother's body. He then called 911 and the police responded "five or ten minutes" later (Id. 75). In the days following, Melvin and George DeJesus came over and George assisted him in moving out his pool table. Although he was sure both brothers witnessed the activity surrounding the discovery of his mother's body, neither of them spoke about his mother. (Id. 76-77).

On cross-examination Jeremy denied using drugs and alcohol but admitted to having served a term in prison. (Id. 80-81; 101). He also disclosed that the light switch in the basement did not work and the

10

florescent lights needed to be plugged in separately. He could not recall whether the lights were on when he discovered his mother's body. (Id. 8)

Pontiac police officer Jeffrey Smith and EMS technician Thomas Hilborn testified as to their respective responses to the 911 call, the discovery of the body, notification of the medical examiner and the securing of the screen. (T.T. 12-4-97 p.p. 9-30). Detective Susan Brown of the Pontiac Police Department testified that she was subsequently called to the scene. Upon review she called for two back-up detectives to canvass the area and contacted the Oakland County Sheriff's Department and requested assistance from their evidence technicians. She testified that the body was subsequently removed from the home and taken to the Medical Examiner's office. (T.T. 12-4-98 p.p. 30-39).

Crime Team Specialist Douglas Ferich testified that he along with Specialists, Jacob, Robinson and Fournier responded to the call for assistance from Pontiac P.D. (T.T. 12-4-97 p.p. 43-44). The scene was secured upon their arrival. The team videoed the crime scene and then still photographs – distant shots and close-ups and preceded to "process things for latent prints or collect evidence". (Id. 48).

As the prosecutor attempted to introduce additional photographs of the victim including autopsy photographs, Defense counsel objected citing the cumulative and excessive nature of the photographs, the fact there was to be medical testimony as well as the testimony of the alleged accomplice as to how the victim died and that prejudicial impact upon

11

the jury – "horrific and inflammatory" -- far outweighed their probative value on premeditation or other elements of the charged offenses. The Court ruled the pictures to be admissible holding the photographs to be "probative in a way that cannot be particularly described by the medical examiner or by other eye witness(es). . .". (T.T. 12-4-97 p.p. 55-66).

Following his depiction of the photographs, Ferich went on to testify as to the gathering of trace evidence hairs and fibers objects from the victim and the scene. He further testified that vaginal and rectal swabs and blood samples were taken from the victim for serological testing at the Michigan State Police Crime Laboratory. (T.T. 12-4-97 p.p. 66-89). Additional blood samples, saliva samples, hairs fibers and footwear from four suspects – the DeJesus brothers, Brandon Gohagen and Kevin Harvey – were submitted to the Crime Lab in November 2995. These items along with blood samples the vaginal and rectal swabs were forwarded to Cellmark Laboratories in January 1996 for DNA testing. No trace evidence was found on the footwear. (Id. 100)

Crime Lab Specialist Daniel Fournier testified he accompanied Deputy Ferich and the rest of the evidence technician team to 659 Peacock on July 11, 1995. After videotaping the scene and assisting in the collection of trace evidence, he analyzed 28 latent prints that were lifted from the scene. These prints were compared with known prints of Margaret Midkiff, Jeremy Wilkes, Melvin and George DeJesus, and Brandon Gohagen. There were only eight prints identifiable and only three were

12

positively compared – one belonging to the victim and two prints belonging to Jeremy Wilkes. (T.T. 12-4-97 p. 142).

Crime Team Specialist Kurt Robinson testified that he accompanied Deputies Ferich and Fournier to 659 Peacock on July 11, 1995. In addition to assisting in the collection of trace evidence, Deputy Robinson compiled three crime scene sketches from which a computer-generated sketch was compiled. (T.T 12-5-97 p.p. 3-10).

Dr. Kanu Virani, Deputy Chief Medical Examiner for Oakland County testified that Margaret Midkiff died of "blunt force head trauma". He further hypothesized that "some object was either applied on the various aspect of her head and face area or her head was probably smashed against the hard but broad surface so it's leaving the mark outside". He also found there to be internal bleeding around the brain creating "brain bruises". (T.T. 12-5-97 p. 16). Upon arrival the victim still had a pillowcase around her head secured with a cord and there were brown bags on her hands and feet to protect from contamination. There was also bruising present in the victim's vaginal and anal areas – consistent with some sort of sexual assault. The swelling of the brain indicated that the victim was alive during the swelling period – anywhere from 15-20 minutes to over an hour. Dr. Virani indicated that the victim's injuries were consistent with being kicked to death. (Id. 27).

On cross-examination Dr. Virani stated he determined the date of the victim's death to be July 8, 1995 and that he arrived at that conclusion

13

based upon the post-mortem changes indicated the victim had been dead 3 to 4 days when discovered and the vaginal and rectal injuries dated from the same time frame as the head trauma. (T.T. 12-5-97 p.p.38-39).

Brandon Gohagen testified that he was 25 years old and that he had known Defendants Melvin and George DeJesus "for years" -- "since junior high school" and that he knew them equally well. He also knew Jeremy Wilkes. (T.T. 12-5-97 p.p. 40-42). Gohagen was then shown a still photograph of Margaret Midkiff taken some time prior to July 8,1995 and he identified the picture as being of the victim. The photograph was admitted without objection. (Id. 43).

Gohagen testified that on July 8, 1995 he was at the DeJesus home in the evening hours and that he Melvin and George were sitting in "a screen house" on the east side of the DeJesus property "listening to the radio, drinking a couple beers, smoke (sic) a little weed". (Id. 44-45). Gohagen stated that Melvin DeJesus began talking about Margaret Midkiff and that he did not like her. Melvin then stated he was "going to go over there and mess with her". A few minutes later, Gohagen and George DeJesus hear a slight whistle and go over to the Midkiff residence. Melvin was standing in the doorway. The three walked into the Midkiff house and followed Melvin to Margaret's bedroom. Melvin then walked in and grabbed Margaret by the hair and pulled her out of bed. He ordered her to disrobe and have sex with Gohagen. Gohagen stated that he and Melvin were armed and that prior to having sex with

14

Margaret he gave his gun to George DeJesus.   George kept the gun and returned it to him the next day.   Gohagen identified the pistol as "my pistol and Melvin's pistol".   Gohagen admitted he did not see Melvin with the gun in the house.   This photograph, was admitted into evidence over the objections of both Defense Counsel.   (T.T. 12-5-97 p.p. 43-63)

Gohagen then had sex with Midkiff -- "possibly" penetrating her anally as well as vaginally.   No one else had sex with Midkiff.   Upon completion of the sex acts, George DeJesus bound the victim's hands and feet with cord.   Melvin assisted him.   George then carried Midkiff over his shoulder out of the room.   Melvin followed along behind. Gohagen remained in the living room for "a couple of minutes".   He then went to the basement where he "saw" Melvin and George in front of the victim who was on her knees in an upright position.   Melvin pushed her over and began kicking her.   Melvin allegedly stated "I know you won't tell anybody, bitch".   George joined in the kicking and "threw in a couple of kicks also."   Gohagen ran out of the house followed by George and Melvin and went to his car and drove away.   (T.T. 12-5-97 p.p. 64-75).

Gohagen went back to the DeJesus residence the following afternoon.   There was no real discussion of Margaret Midkiff.   On July 11, 1995, Gohagen came to the DeJesus home after speaking with George DeJesus on the telephone.   He watched along with Melvin and George and others the processing crime scene at 659 Peacock.   (Id. 78). Gohagen admitted fleeing to Florida with Terrell Gholston after becoming

15

aware of the warrant for his arrest and upon his apprehension, giving a statement to Detective Sergeant Harvey implicating him and the DeJesus brothers in the homicide. (Id. 80)  He denied any initial discussion of a deal for his testimony until prior to the DeJesus preliminary examination when he signed a proffer agreement which allowed him to plead guilty to Second-Degree Murder and First-Degree Criminal Sexual Conduct in exchange for testimony against the DeJesus brothers. Gohagen was adamant he was given no sentencing consideration. The proffer agreement was entered into evidence as Exhibit 24. (Id. 84-88).

On cross-examination, Gohagen admitted to having a prior conviction involving dishonesty and false statement (UDAA) and to being a felon in possession of a weapon. (Id. 89; 91).  He however, denied assaulting two women with a gun. (Id. 98-99)  He admitted that in addition to pleading to Second-Degree Murder and Criminal Sexual Conduct he was not being supplemented as a habitual offender or charged with any weapons offenses. (T.T. 12-5-97 p.p. 100, 121).  He further admitted that if he failed to testify "in good faith," the proffer agreement would become null and void and that he faced the possibility of a First-Degree Murder charge. (Id.  106), and stated that he did not want to spend the rest of his life in prison and that was "part of the reason" for his testimony. (Id. 120)

Gohagen admitted to drinking almost a gallon of beer on the night of question as well as smoking marijuana and could not say what time

16

the homicide occurred.  He further admitted to leaving the state for Texas in 1995 after providing blood, saliva and semen samples to the authorities because he was afraid of being detected and agreed that the DeJesus brothers did not flee with him.  (Id. 142-143).

Crystal Sauro testified that she was the girlfriend of Melvin and she knew his brother George as well.  (T.T. 12-5-97 p. 144).  She testified she had been Melvin's girlfriend since June 1995 and that she and Melvin had a four-month-old child.  (Id. 144-145).  She stated she was interviewed by the investigating officers in this matter and stated that Melvin told her the detectives told him Margaret had called "the cops" on them regarding drug sales.  When pressed by the Prosecutor as to what she told the police, Sauro: "I don't remember". (T.T. 12-5-98 p. 146)

On cross-examination, Sauro reiterated that it was the detectives that informed Melvin about Margaret's alleged call.  She stated she really did not remember the weekend of the homicide because "it was a long time ago".  (Id. 147).  When asked about her usual routine with Melvin on weekends, Sauro proceeded to give her usual routine.  She stated she didn't necessarily remember that particular weekend – only that Melvin's parents were not at home.  She stated her father usually brought her over to Melvin's house in the evening and she would go home the afternoon of the next day and then return again the following evening.  (Id. 148).  She did not remember Brandon Gohagen being there on the weekend in question nor did she remember if George or Melvin's sisters

were present.    On redirect examination, Sauro stated she spent the weekend of July 8, 1995 with Melvin.  However she became confused as to when she arrived at the DeJesus residence on that particular weekend and when confronted with Melvin's alleged statement to the detectives in which he asserted he was at her home until after midnight, on that weekend stated "I don't know.  I don't understand what you are saying".  (Id. 152).

The Prosecution next produced witnesses Hector Negron and Jamie Martin.  Negron and Martin both testified to seeing George DeJesus with scratches shortly after the Midkiff homicide; however, Negron stated the scratches were on George's face while Martin stated they were on his arms.  (T.T. 12-8-97 p.p. 10-20)  On cross-examination, Attorney Willams elicited from Martin that she had never given a written statement to investigators but had orally answered questions at Sergeant Harvey's office.  She stated she could not actually remember which night Friday or Saturday – the party on Robinwood Street occurred which was attended by the Defendants and others.    She admitted if the police report indicated it was a Friday night that would be correct.  Martin further admitted that Brandon Gohagen hated Margaret Midkiff, Midkiff hated Gohagen and that she was the mother of Jeremy Wilkes oldest child.  (Id. 20-24)  On redirect, Martin stated that Melvin DeJesus and Margaret Midkiff did not like each other either.  (Id. 25)

18

Detective Nolan Gottschall testified that he had been a Pontiac police officer for 24 ½ years and was currently assigned to the Oakland County Homicide Task Force. (T.T. 12-8-97 p.p. 26-27). He became involved in the investigation of the Midkiff homicide in October 1995 and subsequently turned the case over to Sergeant Harvey of the Oakland County Sheriff's Department Special Investigation Unit and served as his assistant. (Id. 28).

On September 25, 1996, Detective Gottschall interviewed Melvin DeJesus at the Oakland County Sheriff's Department large interview room. Detectives Kouri and Yuchaz from Pontiac P.P. also interviewed Melvin. Gottschall indicated he got a statement from Melvin DeJesus as to his activities on the night of July 8, 1995. (Id. 30).

Attorney Willams objected to this testimony and voir dired Gottschall as to the circumstances surrounding the September 25th statement. Gottschall indicated he advised Melvin DeJesus of his rights but kept no statement to that effect. He stated unequivocally that the statement was not taped and the questioning began about 6:00 P.M. Mr. Dejesus had been interviewed earlier by Detectives Kouri and Yuchaz and did not appear to be in custody. Sergeant Sutton was present for the interview as well. Gottschall testified Melvin DeJesus did not appear beaten, or intoxicated and in fact appeared very healthy. Gottschall did not know how long Melvin had been at the Sheriff's Department when the

19

statement was given. (T.T. 12-8-97 p.p. 31-33). Defendant's statement was ruled admissible. (Id. 34)

Gottschall testified that Defendant stated that he was with his brother George and Brandon Gohagen in a screen house drinking 40-ounce beers. He further stated that he and Gohagen went to a party at a house on Robinwood and upon leaving the party was dropped off at his girlfriend Crystal's house. He remained at Crystal's until after 12:30 A.M. when Crystal's father took he and crystal to the DeJesus residence where they spent the rest of the evening watching T.V. Defendant denied being in the Midkiff home and alleged that police would find no evidence of him being there. Gottschall found that statement to be unusual, as he had not been questioned about the sexual assault on Midkiff. On cross-Examination, Gottschall admitted that Defendant had previously been subpoenaed and ordered to produce blood, semen and hair samples in this investigation and that there was plenty of opportunity for Defendant to acquire this information although he professed not to have any personal knowledge of that. (Id. 36-37; See also, 54-55).

Gottschall also testified that he interviewed George DeJesus earlier on the 25th, and that George also admitted to being with Gohagen on the night in question. However, he did not record the interview and wrote his report almost three weeks later. (Id. 48) Gottscall also asserted that the lack of DNA evidence on Melvin and George DeJesus did not preclude them from killing the victim. (Id. 57).

Terrell Gholston was voir dired by the Prosecutor concerning a possible attempt by Jackie DeJesus his former girlfriend, and sister of the Defendants to solicit favorable testimony. Gholston asserted that Jackie DeJesus told him they needed someone to state that Brandon was lying and her brothers were set up but did not solicit testimony from him and the matter was abandoned. Gholston reiterated that his October 1, 1996 statement to police was truthful. (T.T. 12-8-97 p.p. 65-69).

Gholston stated he was former boyfriend of Jackie DeJesus and knew the Defendants through Jackie. He also knew Brandon Gohagen and Jeremy Wilkes. In September 1996 Gholston left Michigan for Florida with Gohagen. At the time, Gholston asserted he did not know there was a warrant out for Gohagen's arrest. (Id. 71). Gohagen and Gholston stayed with his present girlfriend's aunt in Tampa and Gholston did not discuss the Midkiff homicide with Gohagen until after both were arrested and in custody. At that point Gohagen told Gholston he had been with Melvin and George DeJesus on the night Margaret Midkiff was killed. Defense Counsel objected to this testimony on hearsay grounds. The Prosecutor countered that Gholston's testimony would be admissible under the prior consistent statement exception – M.R.E. 801(d)(1)(b). The testimony was ruled admissible. (Id. 73-74).

Gholston's testimony concerning his conversation with Gohagen differed from Gohagen's testimony in several important aspects: Midkiff was naked when Brandon entered the room, George and Melvin DeJesus

21

were armed and Gohagen was unarmed. Gohagen was forced to have sex with Midkiff and there was no mention of oral sex. Gohagen told him he was so shocked that he left the house momentarily and when he returned Margaret was tied up in the basement and Melvin was kicking her. Gholston was referred to his statement and then corrected himself that Gohagen told him George tied Midkiff up. (T.T. 12-8-97 p.p. 74-94).

Forensic Scientist David Woodford after being qualified as an expert in the areas of trace evidence and serology, testified that he received a large number of items regarding this case from the Oakland County Sheriff's Department including a rape kit containing vaginal and rectal and oral swabs from the victim. (T.T. 12-8-97 p.p. 97-106). Woodford also received fingernail clippings but determined there was not enough blood present for further serological testing. (Ibid). In November 1995, he received additional hair, blood, semen and saliva samples as well as footwear from four potential suspects, George DeJesus, Brandon Gohagen, Melvin DeJesus and Kevin Harvey. The blood samples were forwarded to Cellmark Laboratories in Germantown Maryland for DNA analysis. Despite all the elaborate packaging and testing of these items, there was no trace evidence lifted from any shoes collected. There were no matches of pubic hair from the suspects. There were no saliva comparisons from the suspects. There were no DNA matches for the blood samples of George and Melvin DeJesus or Kevin Harvey; however,

22

the DNA of Brandon Gohagen could not be excluded as the source of semen and blood found on Margaret Midkiff. (T.T. 12-8-97 p.p.107-141).

Detective Ron Kouri of the Pontiac Police Department testified that he had been a police officer with the city of Pontiac for 2 3½ years and was currently assigned to the Oakland County Homicide Task Force. He testified he interviewed Melvin DeJesus on September 25, 1996 at the Oakland County Sheriff's Department about the murder of Maragret Midkiff and that prior to his interview with Melvin, he had learned that Gohagen had implicated Melvin and George DeJesus in his Florida interview with Detective Harvey. (T.T.12-8-97 p.p. 143-145).

Kouri testified that Melvin DeJesus stated he had spoken with Detectives in the past and that he remembered the Saturday night of the murder quite well. Melvin allegedly stated he had spent the entire evening with his brother George and Brandon Gohagen and stated he was prepared to provide an alibi for Gohagen. When confronted with the information that Gohagen had confessed and implicated the DeJesus brothers, Melvin's "demeanor changed completely" and he attempted to distance himself from Gohagen. (Id. 146-147.

On Cross-Examination, Kouri admitted he had not been at the crime scene when the body was discovered. He stated that he and Detective Yuchaz interviewed Melvin shortly before 5:00 P.M. on the 25th and that he and Yuchaz were the initial interviewers on that date. He kept no interview notes but typed his report within minutes of the interview. He

23

did not place the alibi statement in his report stating "I didn't put everything in there". He was not sure if the interview was taped stating: "They have a lot of video and electronic equipment." (Id. 151-153).

Detective Sergeant William Harvey testified that he was "the" commander of the Special Investigations Unit within the Sheriff's Department" (SIU). He stated he became involved in the investigation of the murder of Margaret Midkiff on September 20, 1995 after being approached by Oakland County Homicide Task Force Detectives Gottshall and Goodrich. (T.T 12-8-97 p.p. 154-155). After reviewing the file, he became convinced there were multiple assailants due to the detailed bindings on the wrists and ankles which would have been "very difficult" for a lone assailant to complete and control the victim. Harvey went on to state over objection, that the photographs indicated that the blows Midkiff received came from different angles and locations indicating multiple perpetrators. (Id. 158-159). Detective Harvey reiterated why an arrest warrant was issued for Brandon Gohagen, detailed his procedure at Gohagen's initial interview and went on to vouch for the credibility of Gohagen asserting: "The statement is the same from then until his testimony here". (Id. 164). Detective Harvey was allowed –over objection – to reiterate Gohagen's testimony to the jury as a prior consistent statement pursuant to M.R.E. 801(d)(1) (b). (T.T. 12-8-97 p.p. 169-177). The Detective also identified Exhibit 24 as the proffer agreement signed by Brandon Gohagen, Gohagen's attorney, the

prosecutor and himself – approximately one week or so before the DeJesus preliminary examination. Harvey also conceded that Gohagen could not be sentenced prior to offering his testimony at trial, as his cooperation might not be forthcoming. (Id. 178-179).

On cross-examination Harvey admitted that Gohagen's statement to him and Gohagen's statement to Gholston had inconsistencies but he believed Gholston became "confused" in his trial testimony (T.T. 12-8-97 p.p. 186-187). He further admitted that Gohagen could have carried Midkiff to the basement and acted alone but "logic" dictated otherwise. (Id. 209). Harvey's additional comments about victimology questions and Midkiff's predisposition not to be bound were objected to as outrageous and were ordered stricken by the Court. (Id. 215-216)

Defense Counsel Williams attempted to produce Detective Sergeant Mike Sutton to testify to Melvin's DeJesus' initial statement to authorities on November 9, 1995 under M.R.E. 803(24) (catch-all exception) and M.R.E. 803(6) (business record exception) to the hearsay rule without having Melvin DeJesus testify in his own behalf. The court denied this motion. A Motion For Directed Verdict was made by Attorney Escabedo.

Defense Counsels called four witnesses: Heather Hunt, Christina Ortega, Denise Model and Jennifer Jones.

Heather Hunt testified that she had dated Brandon Gohagen in the summer of 1995 and had been sexually assaulted by Gohagen after they

were no longer dating. At the time, Gohagen had no problem obtaining an erection. Around the time of the Midkiff homicide Hunt saw a wide scratch on Gohagen's neck and she had assumed it came from "Peggy" a girl Brandon was also seeing. She did not ask Brandon About the Midkiff homicide. (T.T. 12-9-97 p.p. 29-44).

Christina Ortega testified that she was a neighbor of Margaret Midkiff and knew the DeJesus brothers and Brandon Gohagen for "thirteen or fourteen years". Ortega testified that on Saturday July 8th she picked up George DeJesus from his home at 3:00 A.M. and they went to a party on Robinwood Street. She fell asleep at approximately 5:00 A.M., and when she awoke at 9:00 A.M. George was gone. At the party she observed no scratches or cuts on George. She and Jamie Martin made a call to the Midkiff residence in hopes of speaking to Jeremy but got Margaret or her answering machine instead. Attorney Williams attempted to impeach Ortega with her prior statements as to the night of the party but she insisted the party was on Saturday night. (Id. 73).

Denise Model testified she had known Brandon Gohagen for two years and that she began dating him in January 1996. She denied being raped or assaulted with a weapon by Gohagen and indicated she was pregnant by another man. (Id. 80-81).

Jennifer Jones stated she knew Gohagen in July 1995 and that he came to visit her in the middle of the morning on Sunday July 9th – around 3:00 A.M. Gohagen was "really drunk" but she went to bed with

26

him and they had sex.  He remained at her home until 11:00-12:00 the
morning.  He had a large scratch on his neck.  She was uncertain of his
whereabouts prior to his arrival to her home.  (T.T. 12-9-97 p.p. 82-88).

In her closing argument Prosecutor Pendergast returned to the
photo displays stating:

> . . . I told you in opening argument that every picture tells a
> story and now you know that these pictures tell the story of
> Margaret Midkiff, beloved mother, grandmother, a neighbor,
> a victim.  A victim of a horrifying fate.
>
> A horrifying fate, ladies and gentlemen of the jury.
>
> You know the image on the top, smiling forty-three year old
> woman, that's the image her family will carry with them, a
> woman who is smiling beloved mother, and like all of us, had
> her personal demons, but admirably, she had done one heck
> of a job getting her life under control.
> The image on the bottom, that's the image that Jeremy and
> the police will carry forever.  That is something Margaret
> couldn't control.
>
> . . .
>
> When I saw those photographs, in fact all the photographs, I
> shuttered to think what type of person could do this to
> another human being?  What type of person?
>
> . . . This trial has taken an undefined evil, an evil so black
> that your worst nightmare pales in comparison and given
> that evil a human face; the faces of the two men in those two
> chairs, Melvin and George DeJesus, two brutal and savage
> murderers whose acts are so mind-boggling so bone chilling,
> that there is no use in trying to understand, because it's
> pure evil and there is no understanding of pure evil, only
> recognition of what it is . . . .
>
> Melvin DeJesus and George DeJesus are in this courtroom
> because they made a horrifying choice.  Margaret Midkiff is
> in this court without a choice, without a voice.  And all I can
> do is sell you a memory.  She's just a name to you, you can't
> see her like you can see the two defendants; so she remains

in concept, a name, a number, Oakland County Morgue Number 554, for 1995. A bloody image.

Ladies and Gentlemen of the jury, Margaret's cries went unheard that night. But she speaks to you now through the evidence that proves beyond a reasonable doubt that these two defendants are guilty of unspeakable acts; unspeakable acts.

And the evidence does prove the defendants are guilty. And you heard all that evidence in all it's grizzly detail. (T.T. 12-11-97 p.p. 4-9).

The Prosecutor went on to attack Melvin's potential alibi defense claiming on one hand that Defendant's September 25, 1996 statement corroborated Brandon Gohagen's testimony about the screen house and that his "alibi witness" girlfriend Crystal Sauro either could not remember or directly contradicted Defendant's version of what he did on the night of the Midkiff homicide. (Id. 14-17).

The Prosecutor also reiterated Detective Sergeant Harvey's theme on multiple perpetrators asserting:

The crime scene told you more.   Look carefully at the bindings on these ankles and wrists.  That's pretty elaborate stuff.  One person didn't do this.  One person didn't do that. .   . like with multiple perpetrators, multiple armed perpetrators. . .

. . . [L]ook at the marks on Margaret's body.  One person did not do this.  These injuries are on all sides of her body, all angles. . . . .  No these blows were coming from different directions, because they were coming from different people.

Defense Counsel Williams laid the blame for the Midkiff rape and murder squarely on Brandon Gohagen. (T.T. 12-11-97 55). He further theorized that Gohagen set Melvin up as the mastermind of the crime

because he knew Midkiff did not like Melvin and that he had the motivation of a lesser sentence to do so. (Id. 57). Attorney Williams went on to contradict his co-counsel's argument, his client's own statements to police as well as the potential alibi defense stating in part as follows:

> . . . They did not have a real alibi. They lived next door, I'm sure when this was brought up what they were doing that particular weekend.   They didn't know – what they were doing that weekend, or they couldn't be exact about they were doing. So he knew they didn't have an alibi. They were perfect patsys for the people  that did this killing.
>
> So Saturday he may have been home, he may have been in and out of his house.   He may have gone - - Brandon Gohagen may have been there for a while and may have not? Who knows?  But we do know that Brandon Gohagen came back some time Saturday night or Sunday morning and did what he did. (T.T. 12-11-97 p.p. 57-61).

The Court instructed the jury on the elements of the charged offenses.  The jury returned guilty verdicts on all counts.  Petitioner was sentenced as indicated above.

Other facts will be added as necessary in the issues following.

### **Statement Regarding Exhaustion**

Petitioner recognizes that he bears the burden of proving that he has exhausted his state remedies with respect to his habeas claims. E.g., Rust v. Zant, 17 F.3d 155, 160 (6th Cir. 1994).  Petitioner also recognizes that taking his claim to the highest state court is a necessary element of exhaustion, even if review there is discretionary.  O'Sullivan v. Boerckel, 526 U.S. 838 (1999).

29

In support of his position that he has exhausted his constitutional claims, Petitioner states that he has presented the claims within this Petition and Brief in Support to the Michigan state courts, including the trial court, the Michigan Court of Appeals, and Michigan Supreme Court. Petitioner asserts that it is his belief that at every stage of these proceedings the state courts were fairly presented with the substance of his federal constitutional claims and were given a full and fair opportunity to rule on his claims before he sought relief in this Court.

### Statement On Custody

Petitioner was sentenced on December 30, 1997, and this Petition is being filed in April of 2004.  Petitioner is serving life in prison and is currently serving that sentence at the Saginaw Correctional Facility, Freeland, Michigan.  Respondent, Blaine C. Lafler, is Warden of that Michigan Department of Corrections facility.

### Statement On Statute Of Limitations

This action is timely brought under U.S.C. §2244(d)(1)(A).  The last state court judgment on collateral appeal was rendered on January 27, 2004, therefore the Petition for Writ of Habeas Corpus is timely filed.

### Habeas Standards and the AEDPA

Under rules set down in the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEPDA"), a federal court may grant a writ of habeas corpus to a petitioner in state custody with respect to any claim adjudicated on the merits in state court if (1) the state court's decision

was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. §2254 (d)(1)(2).  In <u>Williams</u> v. <u>Taylor</u>, 529 U.S. 362, 412 (2000), the Supreme Court explained that "clearly established Federal law, as determined by the Supreme Court" means Supreme Court decisions.  See: <u>Brumley</u> v. <u>Wingard</u>, 269 F.3d 629 (6th Cir. 2001).

At the same time, "clearly established law" under the AEDPA includes legal principles and standard enunciated in Supreme Court decisions.  As the United State Supreme Court stated, a state court decision makes "an unreasonable application of this Court's precedence" when the court "unreasonably extends a legal principle from our precedent to a new context where is should not apply . . ." but, it is important to emphasize, the Court said at the same time that a lower court also errs when it "*unreasonably refuses to extend that principle to a new context where it should apply.*" <u>Williams</u>, 529 U.S. at 407.

The Court also explained that a state court decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Court on a question of law or is the state court decides a case differently that the Court has on a set of materially indistinguishable facts. 529 U.S. 405-406. An "unreasonable application"

31

occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of the prisoner's case." Id. at 409.

Federal courts must presume the correctness of state court factual findings. 28 U.S.C. §2254 (e)(1). This presumption of correctness is not an insurmountable barrier and a court may set aside deference to those findings if clearly erroneous. See Cremeans v. Chapleau, 62 F.3d 167, 169 (6th Cir. 1995). However, the AEDPA by its own terms is applicable only to habeas claims that were 'adjudicated on the merits in State Court . . ." 28 U.S.C. §2254 (d). Where the state court does not assess the merits of the claim raised in a habeas petition, the deference due under AEDPA does not apply. Wiggins v. Smith, 539 U.S. ___; 123 S. Ct. 2527 (2003); Williams v. Coyle, 260 F.3d 684, 706 (6th Cir. 2001).

Thus, while the hurdles are considerable, this Court not only retains the authority to correct convictions obtained in violation of federal constitutional rights, it has a duty to do so when the violation has a substantial and injurious effect or influence in determining the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 637-638 (1993). This test does not say *only* errors that turn into convictions are harmful. Brecht requires an analysis that is different than simply measuring the sufficiency of the evidence, it asks, "what effect the error had or reasonably may be taken to have had upon the jury's decision." Kyger v. Carlton, 146 F.3d 374, 382 (6th Cir. 1998). Stated otherwise, if this Court harbors "grave doubt" as to whether the error impacted the

32

fairness of the petitioner's trial the writ of habeas corpus should be granted.  O'Neal v. McAninch, 513 F.3d 432, 435 (1995).

Applying the above principles to the issues infra, Petitioner George Luis DeJesus, submits that this Court will find that it is compelled to grant a writ of habeas corpus in order to effectuate constitutional rights.

I.   **THE ADMISSION OF IRRELEVANT AND HIGHLY PREJUDICIAL TESTIMONY ALLEGING PETITIONER WAS A MEMBER OF A GANG DEPRIVED HIM OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL UNDER THE FEDERAL CONSTITUTION.**

### The Issue Involves Clearly Established Federal Law

The Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution encompass the right to a fair trial.   The First Amendment provides for freedom of association.  The decision of the United States Supreme Court in <u>Scales</u> v. <u>United States</u>, 367 U.S. 203 (1984), made it clear that the government may *not* convict based on membership of an organization that advocates illegal activity, since mere membership without more establishes nothing and has no probative value.   <u>United States</u> v. <u>Abel</u>, 469 U.S. 45 (1977), held that admission of gang affiliation evidence was permissible only when relevant to a material issue in the case, such as <u>Abel</u> where members of the same gang whose members were sworn to lie on behalf of each other.  <u>Id</u>. at 49.

Petitioner claims that his right to due process and a fair trial as guaranteed by the Fifth and Fourteenth Amendments, as determined by the United States Supreme Court, 28 U.S.C. §2254(d), were violated where the state trial court denied a mistrial after evidence of gang affiliation was injected into Petitioner's jury trial. The constitutional violation had a substantial and injurious effect or influence in the proceeding as suggested by the United States Supreme Court in <u>Brecht</u> v. <u>Abrahamson</u>, 507 U.S. 619 (1993).

## The Constitutional Violation

Prior to trial, co-counsel moved the state trial judge to exclude any mention of gang membership or gang-related activity relevancy grounds. The prosecution argued that Petitioner's alleged membership in a gang was relevant.  The trial judge, however, disagreed with the prosecutor and excluded any references to gangs or gang activity finding it more prejudicial then probative.  (M.T., 11/26/97, p.p. 17-18).[3]

Skirting the gang issue in her opening statement to the jury, the prosecutor told them that there was "dissention" between Petitioner and the victim and that the DeJesus' home was a "gathering place for their group."  (T.T., 12/2/1997, p. 19). During her examination of Jeremy Wilkes, the deceased's son, she asked Wilkes if he had "hung around" with Petitioner and his brother while they grew up as next-door neighbors.  Wilkes replied that he had not and didn't want to "associate with them" because they were "in a gang and pretty much getting into trouble" and he did not want to "go down the wrong trail." (T.T., 12/2/1997, p.p. 67-68).  Both defense attorneys moved for a mistrial for arguing that the evidence was "inflammatory" and had tainted the jury's perception of the defendants and that the error was especially egregious because the court had already ruled such evidence ruled inadmissible prior to trial (T.T., 12/2/1997, p.p. 105-106).

---

[3]  Under Michigan case law, in a joint trial, an objection by one co-defendant preserves the issue as to the other defendant. People v. Logie, 321 Mich. 303 (1948); People v. Page, 83 Mich. App. 412, 415-416 (1978); People v. Herman Brown, 38 Mich. App. 69, 75 (1972); People v Bradford, 69 Mich. App. 583 (1976).